IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

A & B DISTRIBUTING, INC.,

                             Plaintiff,                              OPINION AND ORDER

      v.
                                                      18-cv-938-wmc

HEGGIE'S PIZZA, LLC,

                             Defendant.

In this civil lawsuit, plaintiff A & B Distributing, Inc. ("A&B"), alleges that defendant Heggie's Pizza, LLC, violated the Wisconsin Fair Dealership Law ("WFDL"), Wis. Stat. § 135.01 *et seq.*, when it terminated its dealership agreement without notice, good cause or right to cure. Before the court are the parties' cross-motions for summary judgment. (Dkt. ##21, 30.) For the reasons that follow, the court will grant in part and deny in part plaintiff's motion for partial summary judgment, finding that the undisputed record establishes that plaintiff was a dealer and, therefore, the WFDL governs the parties' business arrangement, but will deny the rest of the motion, finding disputes of material fact as to whether the WFDL was violated. For these same reasons, the court will deny defendant's motion for summary judgment in full.

UNDISPUTED FACTS[1]

A. **Overview of the Parties**

Plaintiff A&B is a Wisconsin corporation with its principal place of business located

---

[1] The court finds the following facts undisputed and material, unless otherwise noted.

in Danbury, Wisconsin. A&B's owner and sole employee is Alexander ("Al") Vucicevic. Until August 2018, A&B sold defendant Heggie's pizzas to convenience stores, resorts, grocery stores, golf courses and taverns. At that time, A&B had approximately 132 customers.[2] At its high point, A&B had over 160 customers. Throughout their business relationship, A&B would place orders for Heggie's pizzas on a weekly basis and would pick up the pizzas at Heggie's facility in Minnesota typically on Mondays. While A&B could sell other products, Vucicevic avers that sales of Heggie's pizzas accounted for 99% of A&B's business.

Defendant Heggie's is a limited liability company formed in Minnesota, with its principal place of business also in Minnesota.[3] Heggie's was originally founded in 1989 by Don and Polly Hegedus, who began the business in their garage, selling pizzas to resorts and bars in Minnesota and Wisconsin. In 2004, Shawn Dockter and a group of investors

---

[2] In support of this proposed finding, plaintiff offers the declaration of its owner. Defendant purports to dispute this and other proposed facts on the basis that plaintiff does not have any "record evidence" or "substantive evidence." (*See, e.g.*, Def.'s Resp. to Pl.'s PFOFs (dkt. #38) ¶¶ 54, 81.) Given Vucicevic's position with A&B over the life of that entity, however, the number of customers is within his personal knowledge. If defendant wanted to challenge that number, it could have sought company records. If it did, and plaintiff failed to produce those records, defendant should have moved to compel. Positing the lack of record or substantive evidence in the face of Vucicevic's declaration is not a valid basis for disputing this or other facts within his personal knowledge. Plaintiff similarly purports to dispute certain of defendant's proposed findings on the basis that defendant "has provided no documentation to support this proposed finding," but here, too, defendant's president avers to certain facts seemingly within his personal knowledge. (*See, e.g.*, Pl.'s Resp. to Def.'s PFOFs (dkt. #43) ¶ 6.) For purposes of summary judgment, the court has no choice but to reject both sides' assertion of a factual "dispute" absent a reason to doubt an affiant's personal knowledge or contradictory evidence.

[3] As detailed in defendant's notice of removal, Heggie's Pizza, LLC, has several members. (Not. of Removal (dkt. #4) ¶ 4.) None of the members are citizens of Wisconsin. (*Id.* (listing members as citizens of the following states: Minnesota, California, Texas, Iowa, Washington and Colorado).) Given that plaintiff is a citizen of Wisconsin (*id.* ¶ 3), therefore, there is complete diversity under 28 U.S.C. § 1332(a). Moreover, the amount in controversy exceeds $75,000. (*Id.* ¶ 6.)

purchased Heggie's from the Hegeduses. At that time, Dockter became the President of Heggie's and has served in that role during all times relevant to plaintiff's complaint. Since 2004, in addition to Minnesota and Wisconsin, Heggie's has also grown its business to serve North Dakota, South Dakota, Nebraska, Kansas, Missouri, Iowa, Illinois and Indiana. During the course of the parties' relationship, Heggie's used both employee drivers and outside sales persons to distribute its pizzas. As a result, Heggie's maintains that A&B's sales have comprised only a small percentage of Heggie's total sales revenue.

### B. 2004 Agreement

Before it sold defendant's pizzas, A&B sold pizzas for Square One Foods from roughly May 2004 through December 2004 with initial fixed costs of $25,000 to cover the purchase of a truck and freezer. During that roughly seven-month period, A&B had to knock on doors to generate business, resulting in it doubling or tripling its business.

In December 2004, A&B contacted Heggie's about the possibility of selling Heggie's pizzas, purportedly based on its quality. As Heggie's new President, Dockter met Vucicevic in person to "outline the terms of what [their] agreement would be." (Dockter Dep. (dkt. #28) 32.) The parties never entered into a formal written buyer/seller agreement, although plaintiff maintains that they entered into a "gentleman's agreement and/or verbal agreement as to A&B's rights to distribute Heggie's pizzas." (Pl.'s PFOFs (dkt. #25) ¶¶ 10-11.) While defendant argues that whether there was a "gentleman's agreement," or whether A&B "distribute[d]" Heggie's pizzas, are both legal conclusions, Heggie's President Dockter acknowledged at his deposition that the parties entered into a "handshake agreement." (Dockter Dep. (dkt. #28) 32.)

Moreover, there appears no dispute that Heggie's agreed to sell its pizzas to A&B at a rate of 20% to 22% below its set wholesale price initially, eventually increasing to 25% below, and A&B in turn agreed to sell the pizzas at that wholesale price. As such, A&B calculates it "gross profit" was 25% on each pizza sold.[4] Of course, Heggie also made a profit on the sale of pizzas to A&B. Indeed, Heggie's points out that its arrangement with A&B was similar to the arrangement with other customers who took possession of their pizzas at Heggie's plant in Milaca, Minnesota.

In their initial December 2004 conversation, the parties did not discuss how to handle customer complaints, revenue expectations or what would happen if Vucicevic wanted to sell A&B. The parties also did not set a minimum or required number of pizzas that A&B was required to purchase, nor the number of customers it was required to serve.

## C. Ongoing Relationship from 2005 through July 2018

Not one of the customers to which A&B sold Heggie's pizzas was a prior customer of Heggie's. A&B contends that Heggie's assigned it an agreed upon sales territory of northwestern Wisconsin, south of Highway 8.[5] Heggie's disputes that A&B was ever

---

[4] Defendant disputes this figure on the basis that plaintiff failed to lay the proper foundation, including by producing "documentation in support." (Def.'s Resp. to Pl.'s PFOFs (dkt. #38) ¶ 2.) Strictly speaking, the court agrees, since just subtracting the purchase price of a good fails to include other important components of cost of good sold, even for a distributor, like carrying costs of inventory, returns, labor, and shipping costs. However, plaintiff received a 25% discount off of the wholesale price of a single pizza and then sold that pizza at the wholesale price, its "*gross* profit per pizza" could be calculated as 25%, understanding the obvious limitations in that number.

[5] "U.S. Highway 8 (US 8) is a United States Numbered Highway that runs primarily east–west for 280 miles (451 km), mostly within the state of Wisconsin. It connects Interstate 35 (I-35) in Forest Lake, Minnesota, to US 2 at Norway in the Upper Peninsula of Michigan near the border with Wisconsin." "U.S. Route 8," Wikipedia, https://en.wikipedia.org/wiki/U.S._Route_8.

assigned a "territory," and in particular, disputes that the parties ever coordinated or agreed to a set territory. Nonetheless, at least at times, if a potential northwestern Wisconsin customer called Heggie's, Heggie's would contact A&B to alert it of a potential new customer. Moreover, Heggie's instructed its drivers not to target existing customers, including those serviced by A&B. In 2015, Heggie's President Dockter even asked Vucicevic for the list of customers on the south end of A&B's territory so Heggie's would not approach A&B customers.

Initially, Heggie's sold A&B bar signs and menu boards stating, "Heggie's available here," or similar language to distribute to A&B's customers. At some point, Heggie's stopped charging A&B for these signs, meaning Vucicevic was free to take bar signs and menu boards and distribute them to his customers.[6] In developing its customer base, A&B also purchased approximately 150 pizza ovens from Heggie's at $65 each to provide to A&B's customers.

Eventually, A&B also purchased a new delivery truck for approximately $60,000, and a walk-in freezer for $5,500, which was installed in a storage facility that A&B built for $75,000. Heggie's would dispute the freezer and storage building expenses on the basis that: (1) A&B has not provided documentation, although A&B's owner Vucicevic averred as much in his deposition; and (2) A&B has not demonstrated that the freezer is used solely to store pizzas, even though A&B's representation that sales of Heggie's pizzas accounted for 99% of A&B's sales gives rise to a reasonable inference that the freezer was used to store Heggie's pizzas should the jury accept Vucicevic's testimony to that effect.

---

[6] A bar sign cost $0.32, and a menu board cost $1.50.

Vucicevic avers further that "A&B created a market of over $425,000 in [annual] sales of Heggie's pizzas that did not otherwise exist previously." (Vucicevic Aff. (dkt. #23-1) ¶ 9.) Defendant again challenges this figure on the basis that plaintiff submitted no proof of sales, but there is no dispute that Heggie's President Shawn Dockter testified during his deposition that in 2014, which A&B acknowledges was the height of its sales of Heggie's pizzas, A&B sold approximately $440,000 worth of Heggie's pizzas to its customers. (Dockter's Dep. (dkt. #23-2) 65-66.) Defendant further maintains that whatever A&B's sales may have been, they made up only a small percentage of *Heggie's* total revenue.

A&B contends that Heggie's never established expectations as to sales protocols, inventory management requirements or legal requirements relating to the handling of food products. Heggie's disputes this pointing to its president's testimony that at the time the parties' entered into an oral agreement in 2004, they "verbally talked about making sure [Vucicevic] represented the brand well, [and] making sure[ he] followed USDA, FDA guidelines in his actions." (Dockter Dep. (dkt. #28) 32.) Heggie's also maintains that as a separate company, A&B was further required to follow food handling and safety regulations, citing various regulations. (Def.'s Resp. to Pl.'s PFOFs (dkt. #38) ¶ 31.) Still, the parties appear to agree that no "written policies" existed, nor was A&B required to submit business plans or written reports detailing compliance with any policies. Regarding the lack of any written plans or policies, Heggie's contends that there were no such requirements because A&B was simply a customer and not an employee. (*See* Dockter Dep. (dkt. #28) 47-48 (acknowledging that there are no written documents requiring A&B

to comply with procedures).)

### D. Transition Discussions

As early as 2013, Heggie's maintains, and A&B does not dispute, that Vucicevic began to express a desire to sell the company and retire. Heggie's further contends that around that time, A&B's sales also began to decline because it stopped pursing new business. In contrast, A&B represents that the downturn in sales after 2014 was attributable to Heggie's "start[ing] to invade A&B's territory" and "A&B ha[ving] no further room for growth." (Pl.'s Resp. to Def.'s PFOFs (dkt. #43) ¶ 19.)

Regardless, in late July 2018, Dockter and Vucicevic met formally to discuss A&B's plans to continue to sell Heggie's pizza. A&B contends that during that conversation, Vucicevic told Dockter that A&B intended to continue selling Heggie's pizza through at least October 2019, and that this would give Heggie's time to determine how it would compensate A&B for its "sales route." (Pl.'s PFOFs (dkt. #25) ¶ 40.) While Heggie's purports to dispute this fact, it only claims to have "disagreed with A&B's characterization of its business and valuation" (Def.'s Resp. to Pl.'s PFOFs (dkt. #38) ¶ 40), at least allowing the inference that Vucicevic and Dockter discussed the possibility of Heggie's compensating A&B for its territory. Finally, Heggie's maintains that "nothing (no agreement or law) required Heggie's to buy anything from A&B if Vucicevic decided to retire." (*Id.*)

### E. August 2018 Events

By August 2018, the parties had been in a business relationship for almost 14 years.

At that point, A&B maintains it was the last "outside distributor" to sell Heggie's pizzas. (Pl.'s PFOFs (dkt. #25) ¶ 38.)  Heggie's both objects to the use of the term "distributor" to the extent it is intended to have any legal implications, and maintains that "Heggie's has other custo[m]ers who order pizza in bulk and sell the pizzas."  (Def.'s Resp. to Pl.'s PFOFs (dkt. #38) ¶ 38.)  Nonetheless, Heggie's Sales and Logistics Coordinator Marshall Pointer testified at his deposition that since the time he started with Heggie's in 2016, he does not recall any "nonemployee salespersons . . . like Al [Vucicevic] who would come in and buy pizzas and deliver it to their customers."  (Pointer Dep. (dkt. #29) 11.)

On August 1 or 2, 2018, Heggie's received a customer complaint about a bad tasting pizza sold by one of A&B's customers, Almena Meats in Almena, Wisconsin.  Pointer asked A&B to look into the complaint.  In turn, A&B discovered that Almena Meats had a bad freezer, leading to the conclusion that the pizza in question may have thawed and refroze. Heggie's does not dispute this, but contends that A&B failed to ensure that its customers operated their freezers properly.[7]  Vucicevic shared in a follow-up call with Pointer that other customers who purchased Heggie's pizza from Almena Meats also had complained about issues with pizzas, but Heggie's never followed up with those customers.  (*See* Pointer Dep. (dkt. #29) 14 ("And did you follow up with Almena Meats after that at all to find out who the other customers were who might have been at issue?").)

---

[7]  Heggie's also maintains that at this time, it learned of *other* customers who bought pizzas from A&B who had bad freezers.  (Def.'s Resp. to Pl.'s PFOFs (dkt. #38 ¶ 43.)  As evidentiary support, however, Heggie's only cites to a portion of Pointer's deposition, which does not support a finding that there were other A&B customers selling bad pizzas because of bad freezers.  Rather, Vucicevic learned during his investigation that other customers of *Almena Meats* had also complained about bad pizza, not that there were other A&B customers with bad freezers.

On August 14, 2018, Dockter and Vucicevic spoke again by telephone. During that conversation, Vucicevic shared that he would sometimes take pizzas from one customer with only a month of shelf life before expiring and deliver it to a tavern where A&B knew the pizzas would be eaten before their expiration date. After Dockter expressed dissatisfaction with this practice, Vucicevic assured him during the same call, that A&B would adhere to Heggie's requests regarding transferring of pizzas from one customer account to another.

Despite this assurance, Heggie's maintains that Dockter requested a follow-up telephone call on August 17, 2018, to "continue the dialogue, discuss in detail the corrective action plan A&B planned to take, and detail plans A&B claimed it would implement." (Def.'s Resp. to Pl.'s PFOFs (dkt. #38) ¶ 47 (citing Dockter Aff. (dkt. #39) ¶ 23).) During that call, Heggie's also contends Dockter told Vucicevic that A&B would be required to comply with new procedures and complete paperwork to ensure that it was in compliance with government regulations. Heggie's further contends that Vucicevic became enraged and would not allow Dockter to complete a sentence. A&B does not dispute that this was Vucicevic's reaction during the call, but further represents that Dockter told him that A&B was no longer allowed to sell Heggie's pizzas.

Heggie's purports to deny that A&B's relationship with Heggie's was terminated during the August 17 call, but offers only that Vucicevic would not allow Dockter to finish a sentence during the call and that prevented Dockter from discussing any corrective action A&B could take. For his part, Dockter acknowledged at his deposition that he told Vucicevic that "we can't continue to do business [] as we have been currently doing it. We

can't do business together like this." (Dockter Dep. (dkt. #28) 61.) However, at the end of that conversation, Dockter also testified that "Al was still authorized to sell pizzas," but "[w]e literally didn't know if we would see Al on Monday, whether he was going to pick up an invoice or not." (*Id.* at 62.) Vucicevic ended the conversation by telling Dockter that he would hear from his attorney. Whatever the outcome of the August 17 call, the parties agree that A&B was not provided a written notice at that time.

On Monday, August 20, A&B did not pick up any pizzas. Instead, on or about that day, Heggie's contacted one of A&B's larger customer, Holiday gas stations, to arrange pizza deliveries because, Heggie's maintains, it had a responsibility as a corporate managed vendor to serve that account.

## F. Written Notice

In a letter dated August 20, 2018, Attorney Ryan Benson wrote on behalf of A&B to inform Dockter that he had been retained on matters relating "to your telephone conversation that took place on August 17, 2017, wherein you terminated your business relationship with Mr. Vucicevic with no notice or reason." (Benson Aff., Ex. D (dkt. #42-1) 1.) In the letter, Benson also advised that under the Wisconsin Fair Dealership Law, Heggie's is "unable to engage in the conduct that you have engaged in without paying substantial damages to Mr. Vucicevic." (*Id.*)

In a letter dated September 6, 2018, Heggie's counsel Robert S. Halagan then responded, "You are correct that Wis. Stat. Chap. 135 apparently applies to Mr. Vucicevic and his company . . . and Heggies respects its obligations under that statute." (Benson Aff., Ex. E (dkt. #42-2) 1.) Halagan's letter further described various concerns Heggie's

had with A&B's business, including: (1) Vucicevic's intent to sell the business and declining sales over the past five to six years; and (2) A&B's handling of product in the field, including the Almena Meats customer complaint and removing product from one customer to sell at another customer in violation of USDA and FSA food regulations. (*Id.* at 1-3.) Halagan's letter next states,

> Please consider this as notice of termination pursuant to Wis. Stat. § 135.04 of A & B's dealership for good cause as defined under Sections § 135.02(4)(a) and (b) of the statute. The termination shall be effective within ninety (90) days and Vucicevic has sixty (60) [days] under the statute to demonstrate that he has repaired the damage with all of his customers and that similar practices will not occur in the future. While we believe it will be difficult for him to repair the breach of trust he has created, at a minimum we would expect him to do the following:

(*Id.* at 3.) The letter finally lists the following four actions A&B must take to cure: (1) documenting inventory at each of A&B's customers and providing a written report on each; (2) identifying each customer to which A&B previously sold product as new, when it was not new, and attempt to reclaim that product; (3) providing Heggie's with a plan of action on monitoring products; and (4) providing Heggie's with a business plan to increase sales.

A&B does not dispute that it received Halagan's letter, nor the contents of the letter, but contends that its rights to sell Heggie's pizza were already terminated during the August 17 call. A&B also points out that nowhere in the September 6 letter does Halagan challenge its position, as specifically expressed in the August 20 letter, that its relationship with Heggie's had been terminated during the August 17 call.

Following A&B's claimed termination, Vucicevic made no effort to becomes a distributor for any other food products. Instead, at some point, A&B sold its truck and

walk-in freezer.

OPINION

The parties' cross-motions concern two issues: (1) whether the WFDL applies to the parties' business arrangement; and (2) whether defendant violated the WFDL by failing to give proper notice for good cause and a right to cure before terminating the agreement and/or by terminating without good cause? The court addresses each issue in turn below.

## I. Application of the Wisconsin Fair Dealership Law

Wisconsin law defines dealership as:

> A contract or agreement, either expressed or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

Wis. Stat. § 135.02(3)(a). In determining whether that statutory definition is met, Wisconsin courts typically consider three elements: "(1) the existence of a contract or agreement between two or more persons; (2) by which a person is granted one of the rights specified; and (3) in which there is the requisite 'community of interest.'" *Benson v. City of Madison*, 2017 WI 65, ¶ 35, 376 Wis. 2d 35, 897 N.W.2d 16 (citing *Kania v. Airborne Freight Corp.*, 99 Wis. 2d 746, 763, 300 N.W.2d 63 (1981)).

### A. Existence of Agreement Granting Rights

Whether it was a "gentleman's agreement" or a "handshake agreement," there is no

dispute that the parties entered into an oral agreement in December 2004 by which plaintiff was granted the right to purchase Heggie's pizzas at a 20-25% discount off the wholesale price conditioned on A&B selling those pizzas to its customers at Heggie's wholesale price. There also is no material dispute that A&B was allowed to use the Heggie's tradename in advertising in the form of bar signs and menu boards, which A&B originally purchased for a low price but eventually were provided for free to distribute to its customers. *See* Michael A. Bowen *et al.*, *The Wisconsin Fair Dealership Law* § 4.19 (4th ed. 2016) ("The statute acknowledges this phenomenon [of "handshake" agreements] by extending protection to informal business arrangements: contracts or agreements 'either expressed or implied, whether oral or written.' Wis. Stat. § 135.02(3)."). Finally, the parties agree that this business relationship lasted for thirteen and a half years with A&B's annual purchases from Heggie's topping out at approximately $440,000 in 2014.

Despite this undisputed record establishing the first two elements of a dealership arrangement, defendant argues that the parties never agreed to terms of a dealership agreement, specifically identifying the parties' failure to agree on whether the distributorship was exclusive. (Def.'s Opening Br. (dkt. #31) 8.) The cases defendant cites in support of this argument, however, do *not* hold that a dealership agreement must be exclusive to be subject to the protections of the WFDL; rather, those cases address an agreement of exclusivity as a factor in determining whether a community of interest existed or whether the appointment of a new dealer constituted a "substantial change" to that agreement. *See Guderjohn v. Loewen-Am., Inc.*, 179 Wis. 2d 201, 212, 507 N.W.2d 115, 120 (Ct. App. 1993) (relying on the fact that there was no exclusive distributorship as one

factor in determining a lack of community of interest); *Frieburg Farm Equip., Inc. v. Van Dale, Inc.*, 978 F.2d 395, 399 (7th Cir. 1992) (describing an exclusive arrangement as an attribute of a dealership, but not holding that it was a required attribute); *Brauman Paper Co. v. Congoleum Corp.*, 563 F. Supp. 1, 3 (E.D. Wis. 1981) (noting that whether there was an exclusive agreement was crucial to plaintiff's claim that the appointment of a new dealer constituted a substantial change in competitive circumstances in pursuing WFDL claim).

Defendant also argues that the parties did not agree on how to handle customer complaints, revenue expectations, how A&B would deliver pizzas, or what would happen if Vucicevic wanted to sell A&B. (Def.'s Opening Br. (dkt. #31) 8.) Here, too, defendant fails to point to *any* case law that these are required terms for an agreement to fall under the protections of the WFDL. Indeed, in its opposition to plaintiff's motion for summary judgment, defendant cites *Superview Network, Inc. v. SuperAmerica, a Div. of Ashland Oil, Inc.*, 827 F. Supp. 1392 (E.D. Wis. 1993), but in that case the court concluded that the parties failed to reach an oral agreement as to a three-year contract, having only agreed orally to a 15-month trial run. *Id.* at 1396. Here, there is no dispute that the parties agreed on the essential terms of their business relationship: A&B would purchase pizzas from Heggie's at a discounted rate off wholesale pricing and A&B would then sell those pizzas to customers that it had developed at the wholesale price established by Heggie's. Moreover, A&B purchased advertising from Heggie's to display at its customers' locations and purchased some 150 pizza ovens from Heggie's for placement at customer locations. The undisputed record also establishes that the parties had a general understanding as to A&B's sales territory, even if this territory was not exclusive. Specifically, A&B agreed not to sell

14

its pizzas to customers above U.S. Highway 8, with Heggie's alerting A&B to potential new customers and directing its drivers not to approach A&B's established customers.

On this record, therefore, the court concludes that no reasonable jury could fail to find the existence of the first two elements of a dealership as defined by the WFDL given that there is no material dispute that an agreement existed between the parties granting A&B the right to sell Heggie's pizzas using Heggie's trade name. *See Cal. Wine Ass'n v. Wis. Liquor Co. of Oshkosh*, 20 Wis. 2d 110, 122, 121 N.W.2d 308, 315 (1963) ("The law is well settled in Wisconsin that by the conduct and words of the parties the court can imply a contract.").

## B. Community of Interest

The third and final element of dealership under the WFDL requires a "community of interest." The statute defines a "community of interest" as a "continuing financial interest between the grantor and grantee in either the operation of the dealership business or the marketing of such goods or services." Wis. Stat. Ann. § 135.02(1). In *Ziegler Co. v. Rexnord, Inc.*, 139 Wis. 2d 593, 407 N.W.2d 973 (1987), the Wisconsin Supreme Court defined two "guideposts" for determining whether this requirement is satisfied. Consistent with the statutory language, the first guidepost is a "continuing financial interest," which means "a shared financial interest in the operation of the dealership or the marketing of a good or service." *Id.* at 604, 407 N.W.2d at 878. The second guidepost is interdependence, which means "the degree to which the dealer and grantor cooperate, coordinate their activities and share common goals in their business relationship." *Id.* at 605, 407 N.W.2d at 879. For "a community of interest to exist, the continuing financial

interest and the degree of interdependence must be such that termination of the relationship would have a *significant adverse economic impact* on the alleged dealer." *The Wisconsin Fair Dealership Law* at § 4.4 (citing *Ziegler*, 139 Wis. 2d at 605).

The *Ziegler* court also defined a number of factors for courts to consider in determining whether the requisite financial interest and interdependence are present:

1) how long the parties have dealt with each other;

2) the extent and nature of the obligations imposed on the parties in the contract or agreement between them;

3) what percentage of time or revenue the alleged dealer devotes to the alleged grantor's products or services;

4) what percentage of the gross proceeds or profits of the alleged dealer derives from the alleged grantor's products or services;

5) the extent and nature of the alleged grantor's grant of territory to the alleged dealer;

6) the extent and nature of the alleged dealer's uses of the alleged grantor's proprietary marks (such as trademarks or logos);

7) the extent and nature of the alleged dealer's financial investment in inventory, facilities, and good will of the alleged dealership;

8) the personnel which the alleged dealer devotes to the alleged dealership;

9) how much the alleged dealer spends on advertising or promotional expenditures for the alleged grantor's products or services; [and]

10)     the extent and nature of any supplementary services provided by the alleged dealer to consumers of the alleged grantor's products or services.

*Ziegler*, 139 Wis. 2d at 606, 407 N.W.2d at 879-80.

Here, the undisputed record reflects that: the parties had a business arrangement for over thirteen years before it ended; while A&B sold some other products at times, 99% of its business was selling Heggie's pizzas; A&B was provided bar signs with Heggie's

tradename to distribute to its customers to advertise the availability of Heggie's pizzas at those locations; A&B invested some $140,500 in distributing Heggie's pizzas by purchasing a new truck and freezer and investing in a storage facility; A&B's owner and sole employee spent almost all of his work time selling Heggie's pizzas; and A&B purchased approximately 65 ovens for $9,750 to provide customers an easy means to bake Heggie's pizzas onsite. All of these factors weigh strongly in favor of finding a community of interest.

Even acknowledging some uncertainty as to the "extent and nature of the obligations" of the parties, factor 2, the business arrangement was actually quite straightforward and undisputed: Heggie's agreed to sell its pizzas at a reduced price off wholesale on the condition that A&B would in turn sell the pizzas to its customers at its wholesale price. Moreover, while the parties may dispute whether there was a defined "territory," there is no dispute that at least at times, the parties coordinated their actions with respect to developing new or maintaining existing customer relationships. *See Ziegler*, 139 Wis. 2d at 609 n.1 (instructing courts to consider "the manner in which the parties operated under the agreement," including "'the actual duties and responsibilities of each party' in order to determine whether a community of interest exists" (citation omitted)).

In another example of misunderstanding the legal requirements for establishing a dealership subject to the protections of the WFDL, defendant emphasizes that there was no community of interest because "A&B's total sales represented a small portion—roughly 1-2%—of Heggie's total sales revenue." (Def.'s Opp'n (dkt. #45) 4.) But the financial gain the grantor obtains from the dealership agreement is *not* a factor for the court to

consider in determining whether a community of interest exists, or at least defendant has failed to direct the court to any caselaw for such a proposition. Instead, defendant also cites to *Dry Dock, L.L.C. v. Godfrey Conveyor Co.*, 717 F. Supp. 2d 825, 838 (W.D. Wis. 2010), in support of its argument that the *Ziegler* factors foreclose a finding of a community of interest, but the facts in *Dry Dock* are readily distinguishable from those here. Namely, the putative *dealer* in that case offered a diverse array of products, and derived only between 2% and 6% of its revenue from the grantor's products. *Id.* While that case also noted the lack of minimum purchase requirements and required marketing or advertising, those facts must be considered in light of the parties' entire business relationship. Here, the parties' business arrangement may have been simple, but that does not undercut a finding that A&B's financial well-being depended on distributing Heggie's pizza and the parties coordinated their activities to serve A&B's customers south of Route 8.

More relevant is defendant's argument that A&B could use its sunk investments in a new truck, freezer, storage facility and pizza ovens to sell different company's pizza to its customer base. Indeed, A&B had sold a different brand of pizza before Heggie's. Still, the undisputed evidence establishes that A&B invested in the truck, freezer, storage facility and ovens to further its business arrangement with Heggie's Pizza. Perhaps this argument goes to whether termination of the relationship would create a significant adverse economic impact on A&B, *Ziegler*, 139 Wis. 2d at 605, but given that 99 per cent of A&B's business was selling Heggie's pizzas, a reasonable fact finder would have to conclude that an abrupt termination would have a "significant economic impact" on A&B. *Id.* As such, the facts at issue here are distinguishable from the facts in *David Golper Co. v. Cargill, Inc.*, 1995 WL

18

366481, at *6, 195 Wis. 2d 679, 538 N.W.2d 860 (Ct. App. 1995), where the dealer had a significantly more diverse business with relevant sales making up only between 15 to 25 per cent of its total sales and no evidence to suggest the dealer would have difficulty substituting the grantor's product.[8]  Here, A&B had spent years building up Heggie's goodwill among *its* customer base, exactly the kind of sunk investment the WFDL was intended to prevent a grantor from usurping without compensation.  *See Moodie v. Sch. Book Fairs, Inc.*, 889 F.2d 739, 742 (7th Cir. 1989) (explaining that the purpose of the WFDL is "to correct a 'market failure' by protecting dealers who have made such an investment").

Finally, in its September 6, 2018, letter to plaintiff's counsel, Heggie's *admitted* the application of the WFDL to the parties' business arrangement.  (Benson Aff., Ex. E (dkt. #42-2) 1.)  While plaintiff does not argue estoppel, nor does this court find the admission in any way legally binding, the defendant's initial conclusion that the WFDL covered the parties' business relationship was the correct determination.  The court concludes on this record that no reasonable jury could conclude that a community of interest did not exist, and finds on summary judgment that the parties had a "dealership" within the meaning of the WFDL at the time their business relationship ended.

---

[8] In its opening brief, defendant also argued that the parties' business arrangement falls within the "door-to-door" exception to the WFDL under Wis. Stat. § 135.07.  Defendant did not maintain this argument in its reply brief, and for good reason.  The law is clear that the term "door-to-door" means "house-to-house" and does not encompass all sales people who go to a customer rather than serve customers out of a fixed place of business.  *Bush v. Nat'l School Studios, Inc.*, 139 Wis. 2d 635, 658, 407 N.W.2d 883, 893 (1987).  "Such a requirement would ignore the WFDL's legislative history which manifests the legislature's intent not to require businesses to maintain a fixed place of business to receive protection under this act."  *Id.*

## II. Violation of the WFDL

Of course, the finding that the WFDL covers the parties' arrangement does not resolve the parties' dispute since there remains the question as to whether defendant violated the WFDL in terminating the dealership agreement. On that question, there are disputes of fact that preclude entry of summary judgment as set forth below.

### A. Notice and Right to Cure

Wisconsin Statute § 135.04 provides in pertinent part that:

> [A] grantor shall provide a dealer at least 90 days' prior written notice of termination, cancellation, nonrenewal or substantial change in competitive circumstances. The notice shall state all the reasons for termination, cancellation, nonrenewal or substantial change in competitive circumstances and shall provide that the dealer has 60 days in which to rectify any claimed deficiency.

Wis. Stat. § 135.04.

Here, defendant contends that it provided notice and a right to cure as required under the WFDL in its September 6, 2018, letter. Plaintiff does not dispute that the letter would have satisfied the requirements of the WFDL, but maintains that Heggie's had already wrongfully terminated A&B as a dealer during the August 17, 2018, call between Dockter and Vucicevic. As described above, there are genuine issues of material fact both as to what was actually said during that call and whether a reasonable person would have construed Dockter's statements as a termination of the parties' dealership. As such, the

court denies both parties' motions for summary judgment on this issue.[9]

## B. Good Cause

Defendant also seeks summary judgment on the basis that it had good cause to terminate plaintiff as a dealer.[10] The WFDL provides:

> No grantor, directly or through any officer, agent or employee, may terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership agreement without good cause. The burden of proving good cause is on the grantor.

Wis. Stat. § 135.03. "Good cause" is defined as

> Failure by a dealer to comply substantially with essential and reasonable requirements imposed upon the dealer by the grantor, or sought to be imposed by the grantor, which requirements are not discriminatory as compared with requirements imposed on other similarly situated dealers either by their terms or in the manner of their enforcement

Wis. Stat. Ann. § 135.02.

As described by the Seventh Circuit, to show good cause under the WDFL, the grantor must demonstrate: "(1) an objectively ascertainable need for change, (2) a proportionate response to that need, and (3) a nondiscriminatory action." *Morley-Murphy Co. v. Zenith Elecs. Corp.*, 142 F.3d 373, 378 (7th Cir. 1998) (discussing *Ziegler Co. v.*

---

[9] Plaintiff concedes as much in its opposition brief and its reply in support of its own motion for summary judgment. (Pl.'s Opp'n (dkt. #41) 11 ("[T]here is a dispute as to the material fact of when the termination of the dealership occurred."); Pl.'s Reply (dkt. #44) 6 (same).)

[10] Plaintiff initially moved for summary judgment on this basis as well, but in its opposition to defendant's motion and in its reply brief, plaintiff argues that there are material disputes of fact that foreclose summary judgment. (Pl.'s Opp'n (dkt. #41) 12 (arguing that case law requires the issue to be submitted to the jury); Pl.'s Reply (dkt. #44) 7 (same).)

*Rexnord, Inc.*, 147 Wis. 2d 308, 433 N.W.2d 8 (1988)). As an initial matter, should the jury find that defendant terminated A&B without adequate notice and an opportunity to cure, then Heggie's violated the WFDL regardless of whether there was good cause for termination. Perhaps Heggie's could attempt to prove that A&B's damages should be cutoff after the ninety day notice and cure period (or at the time of Vucicevic's planned retirement), *see Moodie*, 889 F.2d at 746, but this would require the resolution of a number of material factual disputes that prevent entry of summary judgment, if not rank speculation.

Even if defendant's written notice and opportunity to cure were deemed effective, there is still the question whether the notice was supported by good cause. In particular, while defendant attempted to stretch its Sales and Logistics Coordinator Marshall Pointer's deposition testimony to encompass wide-spread customer complaints, the record reflects that concerns about poor-tasting pizza were limited to customers of Almena Meats. While that incident identified additional concerns about A&B's transfer of product from one customer to another to extend the shelf-life, a jury will need to determine whether that was good cause to terminate and whether defendant's response -- requiring A&B to document its inventory at each of A&B's customers and providing a written report on each, identify each customer to which A&B previously sold product as new, when it was not new, and attempt to reclaim that product and provide Heggie's with a plan of action on monitoring products -- was proportionate.[11] Moreover, Heggie's failed to argue in its motion for

---

[11] While A&B contends that Heggie's never expressed dissatisfaction with how A&B conducted its business before August 2018, Heggie's purports to dispute this based on a document attached to Dockter's affidavit, listing complaints from June 2017 through August 2018. (Dockter Aff., Ex. A

summary judgment that it had good cause to terminate because of A&B's purported failure to develop business, though that concern was highlighted in the September 6 letter and to cure the default, A&B was required to develop a business plan in response to that concern.

Finally, in light of the undisputed evidence that Vucicevic was interested in retiring and being compensated for his sales route, a reasonable jury could also conclude that defendant's decision to terminate A&B was not for valid concerns about product safety at all, but rather ginned up by Heggie's to support its interest in not compensating A&B for its dealership. At minimum, therefore, the record is *not* "so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015).

Accordingly, the court will deny the parties' cross-motions for summary judgment on whether the WFDL was violated.

---

(dkt. #39-1).) Specifically listed is a complaint dated "6.2017," which states "Al refused to replace broken ovens. Told customer that they were too expensive to replace and that the timers were broken due to intentional abuse." (*Id.*) Similarly, a complaint dated "1.2018" states "Al would only deliver monthly. Customer was constantly running out of product." (*Id.*) However, there is nothing in the record at summary judgment to demonstrate that these complaints were conveyed to A&B, though Dockter averred in his declaration that "[w]hen a complaint came in about A&B, Heggie's would discuss the complaint with A&B." (Dockter Aff. (dkt. #39) ¶ 26.) In addition, neither of these complaints concerned food safety issues purportedly prompting A&B's termination notice.

ORDER

IT IS ORDERED that:

1) Plaintiff A & B Distributing, Inc.'s motion for partial summary judgment (dkt. #21) is GRANTED IN PART AND DENIED IN PART as set forth above.

2) Defendant Heggie's Pizza, LLC's motion for summary judgment (dkt. #30) is DENIED.

Entered this 18th day of November, 2019.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge